IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA YOUNG, *on behalf of*      :
A.C.Y.S.                        :
                                :        CIVIL ACTION
    Appellant,             :
                                :        NO. 1:11-CV-2447-TWT-ECS
v.                              :
                                :
MICHAEL J. ASTRUE,              :
Commissioner of Social Security :
                                :
    Respondent.            :

**FINAL REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff-appellant ("Appellant") A.C.Y.S., through her mother,
Lisa Young, brings this action pursuant to 42 U.S.C. §§ 405(g) and
1383(c) to obtain judicial review of a final decision of the
Commissioner of Social Security ("Commissioner") denying her claim
for Supplemental Security Income. This case is before the Court on
the administrative record and the parties' pleadings and briefs. For
the reasons expressed herein, **IT IS RECOMMENDED** that the
Commissioner's decision be **REVERSED and REMANDED** for further
proceedings consistent with this Final Report and Recommendation.

**I.**
**Procedural History**

On January 19, 2007, Lisa Young protectively filed an
application for Supplemental Security Income on behalf of Appellant,
her minor child, alleging a disability due to asthma, attention

deficit hyperactivity disorder ("ADHD"), and developmental delays, beginning August 25, 2006. (T. 67, 86).[1] Appellant's claim was denied initially on March 22, 2007, and again upon reconsideration on June 21, 2007. (T. 16). On August 25, 2009, an Administrative Law Judge ("ALJ") held a disability hearing. (T. 580). The ALJ issued a decision on October 29, 2009, finding Appellant not to be disabled. (T. 13, 28). The Appeals Council denied her request for review. (T. 5). On July 25, 2011, Appellant filed a complaint in this Court seeking a review of the Commissioner's decision. [Doc. 5].

**II.**
**Factual Background**

Appellant was born on May 20, 1996. (T. 67, 75). She was born in Kansas City, Missouri, (T. 75), and attended school there until moving to Georgia in her third grade year. (T. 256). She was ten (10) years old and in the fifth grade at the time her mother filed for SSI benefits. (T. 89). On the day of the hearing, Appellant was thirteen (13) years old and in the eighth grade. (T. 585).

**A. Medical History**

**1. Asthma**

Appellant's initial asthma diagnosis does not appear in the record, but the condition is noted on school records dating back to

---

[1]     The Administrative Record is abbreviated as "(T. [page])."

2

2004. (T. 263). At her hearing, Appellant testified that her most recent asthma attack occurred in 2008. (T. 599).

A Special Olympics incident report dated September 23, 2008, shows that Appellant had an asthma attack during a softball game on September 20, 2008. (T. 499). The report states that Appellant was running to field a ball when she began coughing.[2] (Id.). Appellant tried using her inhaler four times, but she continued to cough. (Id.). An EMT checked her oxygen level and administered Albuterol through an inhaler for seven minutes, after which Appellant improved. (Id.). She was cleared to go home that same day. (Id.).

On September 28, 2008, just over a week after the Special Olympics asthma attack, Appellant made an emergency visit to Children's Healthcare of Atlanta, complaining of difficulty in breathing and pain in her chest and throat since the previous day. (T. 514, 517). Appellant reported that her asthma had gotten worse despite four uses of her inhaler and a dose of Prednisone. (T. 519). The initial assessment noted a dry cough, hoarse voice, shortness of breath, and a "very mild wheeze." (T. 517-19). Appellant was treated with oxygen, Albuterol, and Atrovent administered via a

---

[2] Treatment notes from Appellant's emergency room visit a week later show that Appellant reported coughing up blood during the Special Olympics attack. (T. 520). At the hearing, Appellant also testified that "the dirt got into me, and I was coughing hard and I started coughing up a little bit of blood." (T. 599). The Special Olympics incident report, however, does not mention blood. (T. 499).

3

nebulizer. (T. 520-21). A repeat examination an hour later showed "no wheeze or difficulty breathing." (T. 519). The treatment notes state that this was "likely [an] asthma exacerbation." (Id.). The next day, Appellant visited Cobb Pediatrics for a follow-up treatment. (T. 425).

On November 11, 2008, Dr. Robert Forbes, Jr., Appellant's pediatrician, completed a form regarding his opinion of the severity of Appellant's asthma. (T. 463-64). Dr. Forbes stated that he had seen Appellant about four times a year since his first examination of her in 2005. (T. 463). In his opinion, Appellant's symptoms met listing 103.03 for asthma because she had "[p]ersistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators" and "[p]ersistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease."[3] (Id.). Dr. Forbes stated that there were X-rays to support such findings. (Id.). He also stated that Appellant met the listing because she required "[s]hort courses of corticosteroids the [sic] average more than 5 days per month for at least 3 months during a 12-month period." (T. 464). Finally, Dr. Forbes stated that he would be

_____

[3] This language from the doctor's assessment tracks listing 103.03(C) for asthma in 20 C.F.R. pt. 404, subpt. P, app. 1.

4

willing to provide additional answers to any questions if the need were to arise. (Id.).

### 2. ADHD & Learning Disability

Appellant's initial diagnosis of ADHD does not appear in the record, but her mother reported that Appellant was first diagnosed when she was two (2) years old. (T. 388). She started stimulant medications for ADHD at age six (6). (Id.).

On April 6, 2005, when Appellant was eight (8) years old, her mother brought her to Children's Therapy Works for an occupational therapy initial evaluation out of concern for Appellant's decreased classroom performance. (T. 371). According to the evaluation form, one of Appellant's teachers had reported that Appellant was hyperactive, did not pay attention in class, and "ha[d] difficulty following directions[] and understanding work placed before her." (Id.). An occupational therapist investigated Appellant's sensory processing, visual perceptual skills, visual-motor skills, gross and fine motor skills, and basic coordination. (T. 374). The results showed that Appellant had "difficulty with sensory processing and motor planning." (T. 376). In particular:

> [Appellant's] difficulties in processing sensory information out of her environment affect[] her arousal level, therefore increasing the activity level. A domino effect is created as one entity affects the other. Due to her high arousal and activity, it becomes increasing[ly] difficult for [Appellant] to follow directions and stay seated which may be misinterpreted as behavioral issues.

5

(T. 376). "As a result, [Appellant] is constantly seeking movement and is always 'on the go.'" (T. 374). Occupational therapy progress notes from June 29 and July 6, 2005, show diagnoses of coordination disorder/dyspraxia syndrome, "verbal apraxia symbolic dysfunction apraxia," and ADHD. (T. 384, 386).

On March 23, 2006, when Appellant was nine (9) years old, she met with Dr. Gary M. Miller of Pediatric Neurology of Georgia for a consultation regarding learning difficulties. (T. 388). Appellant's mother reported that Appellant's problems with reading and "impulsive and fidgety behavior" had persisted "despite treatment with Adderall XR 20 mg daily and previous treatment with Concerta 27 mg daily." (Id.). Dr. Miller noted that Appellant had a "[l]ong-standing history of academic difficulties . . . . [but] no evidence of any regression in her skills." (T. 389). His impression was that "the diagnosis of ADHD seems appropriate, however co-occurring learning difficulties or a mild cognitive impairment should be investigated." (Id.). He recommended an electroencephalogram ("EEG") and neuropsychological testing.[4] (Id.).

Michele Harris, Appellant's fifth grade classroom teacher, completed a Social Security Administration teacher questionnaire on February 9, 2007. (T. 96-103). She noted that Appellant's reading,

---

[4]     The record does not show that either the EEG or neuropsychological testing were performed.

writing, and math skills were all at a third grade level and that Appellant needed "frequent reteaching & a structural setting." (T. 96-97). In the section provided for "acquiring and using information,"[5] Ms. Harris indicated that Appellant had "[a]n obvious problem" in comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (T. 97). In her assessment of Appellant's "attending and completing tasks," Ms. Harris noted that Appellant had "[a]n obvious problem" in completing classroom and homework assignments and in completing work accurately without careless mistakes. (T. 98). Ms. Harris also noted that Appellant was "extremely hyper when not on medication." (T. 102).

On May 28, 2009, Appellant's mother took her to the DeKalb Community Service Board "at [the] recommendation of [her] SSI attorney." (T. 506). Margaret Redus, a licensed clinical social worker, noted that Appellant showed symptoms of ADHD: being "very restless," having a short attention span, and interrupting often. (Id.). Ms. Redus also noted Appellant's reported "oppositional

---

[5]    See infra Part III for a description of the "domains" along which the Social Security Administration assesses childhood development.

behavior at school and frequent[] fights w[ith] younger sisters."
(Id.). The clinical assessment indicated that Appellant had
"moderate" problems with impulse control, attention, and
inappropriate expressions of anger. (T. 500).

Dr. Mridula Puri conducted a psychiatric diagnostic interview
with Appellant on June 9, 2009. (T. 507). Dr. Puri commented that
Appellant's mother's complaints were "vague" and noted that "Mom is
fighting SSI case since 2005 and this is part of the effort she
indicates." (Id.). Her psychiatric assessment stated that
"[Appellant] has had some issue with authority and feels teachers
and kids should accept her for who she is and wants them to change."
(Id.). She also assessed Appellant's reading level as "slightly low"
and her IQ as "low av[erage]." (Id.). Dr. Puri saw a "need for anger
management" and recommended continuing the currently prescribed
medications for ADHD. (T. 508).

The record contains three teacher questionnaires provided by
the DeKalb Community Service Board, two of which are dated September
3, 2009. (T. 344-46). The questionnaires provide a list of twenty-
eight behavioral traits, with columns for the teachers to assess
each trait with regard to Appellant as "not at all," "just a
little," "pretty much," or "very much." (Id.). On whether Appellant
had "difficulties in learning," Appellant's language arts teacher
marked "just a little," (T. 345); her science teacher marked "pretty

8

much," (T. 346); and her social studies teacher marked "very much," (T. 344).

On September 8, 2009, Appellant and her mother returned to the DeKalb Community Service Board. (T. 549). Margaret Martin, another licensed community social worker, reviewed two of the teacher questionnaires[6] and commented that "[t]hey were generally good," noting "no issues at home or sch[ool]." (Id.). Ms. Martin "[e]xplained that since [Appellant] doesn't seem to be having any difficulties [at] this time, [they] can make [an appointment] for 1 month to review." (Id.).

Appellant and her mother saw Ms. Martin again on January 26, 2010, regarding "complaints about [Appellant] and sister having conflict that incl[uded] yelling, pushing several times per day." (T. 552). Ms. Martin noted that "[Appellant] is continuing to be treated for ADHD by her pediatrician," and that "[Appellant's mother] doesn't mention any concerns about this." (Id.). Ms. Martin treated by "explor[ing] [Appellant's mother's] response to children's b[ehavior] which is by talking to them." (Id.).

---

[6] The treatment notes do not indicate which two questionnaires Ms. Martin reviewed.

**B.   School Records**

   **1.   Cognitive/Intellectual Assessment**

On October 25, 2004, when Appellant was eight (8) years old and in the third grade, Dr. Jasper Harris administered the Wechsler Intelligence Scale for Children-Fourth Edition ("WISC-IV") on behalf of the Blue Springs School District in Missouri. (T. 262, 265). The WISC-IV assesses "the general thinking and reasoning skills of children aged 6 years to 16 years" and returns five scores: verbal comprehension, perceptual reasoning, working memory, processing speed, and full scale IQ. (Id.). The highest possible score is 160 and the lowest is 40, with scores from 90 to 109 considered average. (T. 266). Appellant scored 87 in verbal comprehension, 96 in perceptual reasoning, 88 in working memory, and 97 in processing speed, with a full scale IQ of 89. (Id.).

The only other cognitive assessment in the record appears in Appellant's special education eligibility report for the Cobb County School District. (T. 253). The report shows that Appellant took the Wechsler Preschool and Primary Scale of Intelligence ("WPPSI") in September of 2001, at the age of five (5). (Id.). According to the WPPSI, Appellant had a verbal IQ of 76, a performance IQ of 74, and a full scale IQ of 72. (Id.).

Appellant has not had another cognitive assessment or IQ test since the WISC-IV Dr. Harris administered in 2004.

AO 72A
(Rev.8/82)

### 2. Individualized Education Program

When Appellant was in the third grade, she and her mother moved from Missouri to Georgia, and Appellant began attending public school in the Cobb County School District. (T. 256). In Missouri, Appellant had received special education services through that school district's speech-language program. (Id.). In Georgia, though, a school-administered evaluation in 2005 determined that Appellant did not qualify for speech-language services because her "language skills appear to be within normal limits." (T. 258). Because of her ADHD, however, Appellant was eligible for special education services on the basis of "Other Health Impaired." (T. 259). On this basis, the Cobb County School District developed an individualized education program ("IEP") for Appellant. (T. 258, 278).

In 2006, when Appellant was in the fifth grade, she transferred to another Cobb County school and her IEP was reevaluated. (T. 139). According to the fifth grade IEP, Appellant would attend physical education, music, art, science, and social studies in the general education classrooms, with no special education support. (T. 146). Appellant's classes in math, language arts, and reading, however, would be taught in small special education groups. (Id.). Appellant would also take the Criterion-Referenced Competency Tests, see infra

Part II.B.3., in a small group; and the tests would be read to her. (T. 148).

An IEP evaluation in March of 2009, when Appellant was in the seventh grade, indicated that Appellant was reading on a fifth grade level:

> [Appellant's] readig [sic] on a fifth grade level. [Appellant's] reading comprehension is on a 5th grade level. She struggles identifying the main idea, and answering factual questions. Written expression is difficult for [Appellant]. She has trouble develping [sic] her ideas, and using grammar consistently. Her writing skills are on an upper 5th grade level.

(T. 278, 281).

Regarding Appellant's eighth grade IEP, her mother testified at the hearing that Appellant attended the same classes as the non-special education students, but that she spent about one-third of each class in a smaller group with a special education teacher. (T. 605).

### 3. Criterion-Referenced Competency Tests

Georgia law requires core curriculum-based tests to be administered to students each year in grades one through eight. O.C.G.A. § 20-2-281. These tests are known as the Criterion-Referenced Competency Tests ("CRCTs"). § 20-2-281(a). A student must perform at grade level on the CRCT in order to be promoted to the fourth grade, the sixth grade, or the ninth grade. § 20-2-283(b)(1).

12

Appellant's mother testified that Appellant failed her fifth grade CRCT on the first attempt, but that the school allowed her to take it again after attending summer school. (T. 602-03). In summer school, "they were able to work with her at a slower pace and in smaller groups," and Appellant passed the CRCT on her second attempt. (T. 603).

Appellant took the sixth grade CRCT in the spring of 2008. (T. 306). Each subject required a minimum score of 800 to meet the expected standard for sixth grade students. (T. 306-08). Appellant's scores fell short of the standard in reading, mathematics, science, and social studies. (Id.). The only subject in which she met the standard was English/language arts, scoring an 808. (T. 307). The record does not show whether Appellant took the sixth grade CRCT a second time.

In the spring of 2009, Appellant took the CRCT for seventh grade. (T. 305). Her scores on the reading, English/language arts, and science sections of the test failed to meet the expected standard for seventh grade students. (Id.). In mathematics, however, she met the standard by scoring one (1) point above the minimum score required. (Id.). Her CRCT test record does not include a score for social studies from that year. (Id.). The record also does not show whether Appellant retook the seventh grade CRCT.

13

## C.    State Agency Reviews

On March 21, 2007, John Petzelt, Ph.D., Thomas Scott, M.D., and Patty Higgins, speech-language pathologist, completed an initial childhood disability evaluation form regarding Appellant's application for SSI benefits. (T. 394-95). They found that Appellant's ADHD, asthma, and previous history of a language impairment were severe, but not severe enough to meet or equal a listing. (T. 394). In particular, the state agency consultants found that Appellant had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. (T. 396). Regarding the domain of acquiring and using information, they noted that Appellant had a WISC-IV verbal comprehension score of 87, a perceptual reasoning score of 96, and a full scale IQ of 89. (Id.). They also found that Appellant had no limitations in moving about and manipulating objects, caring for herself, or health and physical well-being. (T. 397). Their comments for the domain of health and physical well being recognized Appellant's history of asthma but noted the lack of any documented emergency room admissions for the preceding year. (Id.).

On June 21, 2007, Eva Harris, M.D., David Williams, Ph.D., and Lue Dunagan, speech-language pathologist, completed another childhood disability evaluation form at the reconsideration level.

14

(T. 400-01). They recognized Appellant's ADHD diagnosis, but noted that the symptoms were "largely in remission" with medication. (T. 400). They also noted Appellant's previous history of a language impairment but, contrary to the previous state agency consultants, they did not identify asthma as one of Appellant's impairments. (<u>Id.</u>). Their findings regarding the extent of Appellant's limitations in the six domains were identical to those of the first consultants. (T. 402-03). In the explanation of acquiring and using information, however, they did not rely on Appellant's IQ scores, but instead referred to two teacher questionnaires that identified Appellant as having "moderate problems with cognitive [abilities]." (T. 405). Affirming the previous evaluation, they found Appellant's impairments insufficiently severe to meet or equal a listing. (T. 400).

### III.
### <u>Standard for Determining Disability</u>

A child under the age of eighteen (18) is considered to be disabled and eligible for disability benefits if she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); <u>accord</u> 20 C.F.R. § 416.906. As in all

AO 72A
(Rev.8/82)

Social Security disability cases, the claimant bears the ultimate burden of proving disability by providing medical and other evidence of the claimed impairments. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a); see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987).

In evaluating a claim, the ALJ must follow a three-step procedure of evaluating whether: (1) the child is engaged in substantial gainful activity; (2) the child has an impairment or combination of impairments that is severe; and (3) the child's impairment or combination of impairments causes functional limitations that meet, medically equal, or functionally equal the listing of impairments.[7] 20 C.F.R. § 416.924(a); see also §§ 416.902, 416.911(b)(1). A child's limitations meet the listings "if the child actually suffers from the limitations specified in the [l]istings for that child's severe impairment." Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1279 (11th. Cir. 2004). A child's limitations medically equal the listings if, in comparison with "closely analogous listed impairments," they are "at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 416.926(b)(2).

---

[7]    The listing of impairments is found at 20 C.F.R. pt. 404, subpt. P, app. 1.

AO 72A
(Rev.8/82)

If the child's limitations do not meet or medically equal a listed impairment, the ALJ may still find those limitations to functionally equal those in the listings. § 416.926a(a). "In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities." Shinn, 391 F.3d at 1279. The ALJ must consider the extent to which the child's impairment(s) limits functioning in the following six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. § 416.926a(b)(1). A child's impairment(s) is of listing-level severity if the child has "marked" limitations in two of the six domains or an "extreme" limitation in one. § 416.926a(d).

## IV.

### The ALJ's Decision

In his October 29, 2009, decision, the ALJ found Appellant not to be disabled at any time from January 19, 2007, the protective filing date, through the date of his decision. (T. 28). In particular, the ALJ first found that Appellant was a school-age child on the date of filing, and that she had not been engaged in substantial gainful activity since the protective filing date. (T.

17

19). Next, the ALJ found that Appellant had severe impairments of ADHD, a learning disability, and a history of asthma that was well controlled with medications. (Id.). The ALJ found, however, that none of Appellant's impairments or combinations thereof met, medically equaled, or functionally equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Id.).

In conducting the functional equivalence inquiry, the ALJ found that Appellant had a marked limitation in the domain of attending and completing tasks, but less than marked limitations in the domains of acquiring and using information, interacting and relating with others, moving about and manipulating objects, and health and physical well-being. (T. 22-27). The ALJ also found that Appellant had no limitation in her ability to care for herself. (T. 27). Accordingly, the ALJ found Appellant not to be disabled. (T. 28).

## V.
### Standard of Review

The scope of judicial review of the Commissioner's decision is limited. The Court's function is to determine if the decision is supported by substantial evidence and based upon proper legal standards. See Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The ALJ's decision will not be disturbed by the Court if, in light of the record as a whole, it appears to be supported by substantial

18

evidence. See 42 U.S.C. § 405(g); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. MacGregor, 786 F.2d at 1053. In contrast, review of the ALJ's application of legal principles is plenary. Foote v. Chater, 67 F.3d 1553, 1558 (11th Cir. 1995).

## VI.

### Discussion

Appellant contends that the ALJ erred by (1) applying the wrong standard to the opinion of Appellant's sole treating physician; (2) failing to find that Appellant had a marked limitation in the domain of acquiring and using information; (3) failing to order a consultative examination regarding Appellant's psychological and cognitive impairments; and (4) finding Appellant's subjective complaints and her mother's testimony not to be credible. [Doc. 15 at 14, 18, 21, 23]. Appellant thus argues that a reversal and directed finding of disability, or a remand for further administrative proceedings, is warranted. [Id. at 25].

As explained below, the undersigned finds no error in the weight assigned to the opinion of Appellant's treating physician. Nevertheless, the undersigned finds that the ALJ erred in finding Appellant to have a less than marked limitation in the domain of

19

acquiring and using information. To the extent the ALJ relied on Appellant's IQ scores in his decision, the ALJ also erred in failing to order a more current cognitive assessment. The ALJ also erred in the credibility determination of Appellant's and her mother's testimony. Thus, **IT IS RECOMMENDED** that the ALJ's decision be **REVERSED and REMANDED** for additional proceedings consistent with this Final Report and Recommendation.

## A. Did the ALJ Apply an Inappropriate Standard to Appellant's Treating Physician's Opinion?

First, Appellant argues that the ALJ failed to apply the proper standards in assessing Dr. Forbes's opinion that Appellant's asthma functionally equaled the listing. [Doc. 15 at 14-15]. The Commissioner challenges Appellant's interpretation of the Social Security regulations and argues that the ALJ applied the correct legal standards in discounting Dr. Forbes's opinion. [Doc. 16 at 14]. The Court finds no error in the ALJ's assessment of Dr. Forbes's opinion.

### 1. Did the ALJ Err by Not Granting Controlling Weight to Dr. Forbes's Opinion?

Appellant argues first that, because Dr. Forbes is the only treating physician on record to offer an opinion about the severity of Appellant's asthma, the ALJ should have given controlling weight

AO 72A
(Rev.8/82)

to his opinion that Appellant's symptoms met the listing for asthma. [Doc. 15 at 16]; [Doc. 17 at 1, 3]. The Commissioner responds by arguing that the ALJ properly rejected Dr. Forbes's opinion as unsupported by the evidence, including his own treatment notes. [Doc. 16 at 10]. The Commissioner further argues that the ALJ was not required to afford Dr. Forbes's opinion controlling weight because the determination of whether a claimant meets or equals a listing is reserved to the Commissioner. [Id.].

The Social Security regulations provide that a treating physician's opinion regarding the nature and severity of a claimant's impairment will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 416.927(c)(2). Nevertheless, the question of whether a claimant's limitations meet the listings "is usually more a question of medical fact than a question of medical opinion," and, "[i]n most instances, . . . is simply a matter of documentation." SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996).[8] Similarly, "[a] finding of equivalence involves more than findings about the nature and severity of medical

_____

[8]    In the Eleventh Circuit, Social Security Rulings ("SSRs") are not binding on the Court but are entitled to deference. Fair v. Shalala, 37 F.3d 1466, 1467 (11th Cir. 1994).

21

impairments. It also requires a judgment that the medical findings equal a level of severity set forth in [the listings]." Id. at *4. Accordingly, the determination of whether a claimant's impairment meets or equals the listings is ultimately reserved to the Commissioner. 20 C.F.R. § 416.927(d)(2); SSR 96-5p, 1996 WL 374183, at *3-4. Although the ALJ must consider the claimant's medical source opinions, "the adjudicator is precluded from giving any special significance to the source; e.g., giving a treating source's opinion controlling weight, when weighing these opinions on issues reserved to the Commissioner." SSR 96-5p, 1996 WL 374183, at *3; accord 20 C.F.R. § 416.927(d)(3).

Here, Dr. Forbes submitted an Impairment for Children form that stated Appellant met the listing for asthma under 103.03(C). (T. 463-64). Listing 103.03(C) requires:

> Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
>
> 1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
>
> 2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period.

20 C.F.R. pt. 404, subpt. P, app. 1, sec. 103.03(C). Dr. Forbes indicated that Appellant's symptoms met the requirements in both 103.03(C)(1) and (2). (T. 463-64).

The ALJ did not err in declining to afford Dr. Forbes's opinion controlling weight. First, while the ALJ is required to consider the medical opinion of Appellant's treating physician, the Social Security regulations explicitly provide that the decision of whether Appellant's symptoms meet a listing is an issue "reserved to the Commissioner." 20 C.F.R. § 416.927(d)(2). Indeed, the stated purpose of Social Security Ruling 96-5p is "to emphasize . . . [t]hat treating source opinions on issues reserved to the Commissioner are *never* entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *1 (emphasis added).

Second, the undersigned finds that substantial evidence supports the ALJ's finding that Dr. Forbes's opinion was inconsistent with the evidence of record. In discounting Dr. Forbes's opinion, the ALJ referenced Appellant's treatment notes from Cobb Pediatrics, noting:

> Physical examinations are noted to be completely normal, including her lungs, with no evidence of asthma exacerbations, wheezing or other respiratory deficits. While there is a diagnosis of asthma this condition is successfully controlled with nebulizer treatments and medications. Medication lists at Exhibit 18E shows one prescription for Prednisone prescribed on November 8, 2008, with the previous prescription back in August 2006.

23

(T. 20). Appellant takes issue with the ALJ's failure to provide a record citation in regard to Dr. Forbes's treatment notes, [Doc. 15 at 16], but the undersigned finds that the reference to "[t]reatment notes covering the period March 16, 2006, through September 29, 2008," (T. 20), adequately identifies which notes the ALJ relied upon. A careful review of the treatment notes from this period, (T. 425-34), supports the ALJ's finding that Appellant's asthma was below listing-level severity. Significantly, the treatment notes indicate Appellant's lungs as "normal" at each examination, even the one following her asthma attack of September 28, 2008. (T. 425).

The documentation of the September 28, 2008, asthma attack, however, as well as the one from the Special Olympics, would appear to contradict the ALJ's finding of "no evidence of asthma exacerbations, wheezing or other respiratory deficits." On this point, Appellant argues that the ALJ should also have considered her mother's testimony "that [Appellant] had frequent wheezing . . . . [and] attacks about every three weeks, but [that] she treats her at home and calls in the event to the physician." [Doc. 15 at 16]. To the extent the ALJ understated the evidence of Appellant's asthma exacerbations, the Court finds this to be harmless error. Asthma attacks alone do not meet listing 103.03 unless they "require physician intervention" and occur "at least once every 2 months or

at least six times a year." 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 103.03(B). The record in this case shows only two attacks requiring physician intervention: (1) on September 20, 2008, at the Special Olympics softball game, (T. 499); and (2) on September 28, 2008, when Appellant had to go to the emergency room, (T. 519). The asthma attacks that occur every three weeks, according to Appellant's mother's testimony, are treated at home and therefore do not require physician intervention. Thus, even if the ALJ had considered this evidence, it would have been insufficient to meet the listing under 103.03(B).

Moreover, a consideration of Appellant's mother's testimony regarding wheezing would not have changed the ALJ's finding that she failed to meet the listing under 103.03(C)(1). Even if that testimony were sufficient to establish "[p]ersistent low-grade wheezing" or "[p]ersistent prolonged expiration," the record is nevertheless devoid of radiographic evidence of pulmonary hyperinflation or peribronchial disease, which the listing requires. 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 103.03(C)(1).

Furthermore, substantial evidence supports a finding that Appellant did not pursue "[s]hort courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period." 20 C.F.R. pt. 404, subpt. P, app. 1, sec.

25

103.03(C)(2). The ALJ identified only two Prednisone prescriptions in as many years: one in August 2006, and another in November 2008.[9] (T. 20). A review of the record, however, shows that Appellant received another Prednisone prescription in September 2008, (T. 203, 354); a Triamcinolone prescription in August 2007, (T. 205); and a prescription for Fluticasone in November 2008, (T. 355).[10] The Prednisone prescriptions of September and November 2008, however, were for only three (3) tablets, to be taken once daily. (T. 354, 356). At the hearing, Appellant's mother testified that, when Appellant is prescribed Prednisone, it is only for four days. (T. 616). Thus, the ALJ did not err in finding no evidence that Appellant took corticosteroids for more than five days a month for three months of a twelve-month period.

Accordingly, substantial evidence supports the ALJ's finding that Appellant's symptoms did not meet listing 103.03 for asthma,

---

[9]   Appellant argues that the ALJ erred by supporting this point with a citation to non-medical evidence, [Doc. 15 at 16], but the Court finds this argument to be meritless. The ALJ cited the medication lists as exhibit 18E, but exhibit 18E is actually three teacher questionnaires. Appellant's history of prescriptions is instead found at exhibit 19E. In light of the fact that the ALJ identified exhibit 18E as "[m]edication lists," the Court finds it to be more reasonable that the ALJ made a typographical error than that he intended to rely on teacher questionnaires to support a finding regarding Appellant's prescription medications.

[10]   Prednisone, Triamcinolone, and Fluticasone are all corticosteroids. U.S. NAT'L LIBRARY OF MED., NAT'L INSTS. OF HEALTH, http://www.nlm.nih.gov (last visited Nov. 21, 2012).

AO 72A
(Rev.8/82)

and the ALJ did not err in failing to give Dr. Forbes's opinion controlling weight. See Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam) (finding no error when ALJ articulated specific reasons for failing to give opinion of treating physician controlling weight and those reasons were supported by substantial evidence).

### 2. Did the ALJ Err by Not Recontacting Dr. Forbes?

Next, Appellant argues that, upon finding Dr. Forbes's opinion to be inconsistent with the evidence, the ALJ should have recontacted Dr. Forbes for clarification of the basis for his opinion. [Doc. 15 at 17]. The Commissioner responds that the ALJ was not required to recontact Dr. Forbes in this case because the record contained sufficient evidence for the ALJ to determine whether Appellant's asthma met or equaled a listing. [Doc. 16 at 14].

Because a disability hearing is not an adversarial proceeding, the ALJ has "a basic obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (per curiam); see also Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam). At the time of the ALJ's decision, the Commissioner's regulations required the ALJ to recontact the claimant's treating physician for additional information if the evidence from that source (1) was inadequate to make a determination of disability; (2)

"contain[ed] a conflict or ambiguity that must be resolved"; (3)
"[did] not contain all the necessary information"; or (4) "[did] not
appear to be based on medically acceptable clinical and laboratory
diagnostic techniques." 20 C.F.R. §§ 404.1512(e), 416.912(e),
repealed by How We Collect and Consider Evidence of Disability, 77
Fed. Reg. 10,651, 10,655-56 (Feb. 23, 2012); accord SSR 96-5p, 1996
WL 374183, at *6. The Eleventh Circuit has further clarified that
"[i]n evaluating the necessity for a remand, we are guided by
whether the record reveals evidentiary gaps which result in
unfairness or clear prejudice." Brown v. Shalala, 44 F.3d 931, 935
(11th Cir. 1995) (per curiam) (internal quotation marks omitted).

Here, the ALJ did not err by failing to recontact Dr. Forbes
for additional information. First, the ALJ did not find that Dr.
Forbes's treatment records were inadequate for determining whether
or not Appellant was disabled. Neither did the ALJ find the records
to be ambiguous, incomplete, or not based on medically acceptable
techniques. Instead, the ALJ reviewed two and one-half years worth
of treatment notes, along with Appellant's prescription medication
records, and found that they did not support the doctor's finding
that Appellant met the listing for asthma under 103.03(C). (T. 20-
21). The ALJ need not recontact Appellant's treating physician
merely because he disagrees with his opinion on an issue reserved
to the Commissioner. Compare Brown, 44 F.3d at 935-36 (finding that

28

ALJ had obligation to recontact treating physician for updated records when claimant testified that physician had examined her again just prior to the hearing), with Wind v. Barnhart, 133 F. App'x 684, 393 (11th Cir. 2005) (holding that ALJ did not need to recontact treating source when record did not show that doctor had made additional findings). Accord White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001) ("[I]t is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the evidence the ALJ receives from the claimant's treating physician that triggers the duty.") (internal quotation marks and brackets omitted).

Second, Appellant has made no showing of what additional information the ALJ should have sought from Dr. Forbes or how its absence from the record prejudiced her. Notwithstanding the ALJ's duty to develop the record, a remand is not necessarily warranted "any time a claimant alleges that the ALJ has neglected to complete the record." Brown, 44 F.3d at 936 n.9. Rather, "there must be a showing of prejudice before we will remand for further development of the record." Robinson v. Astrue, 365 F. App'x 993, 995 (11th Cir. 2010) (per curiam) (citing Brown, 44 F.3d at 935). Thus, without a showing that Dr. Forbes possessed relevant evidence not found in the record, and that this additional evidence would have changed the

ALJ's decision, a remand to develop the record on this ground would be inappropriate.

Accordingly, the undersigned finds no error in the ALJ's decision not to recontact Dr. Forbes for additional fact-finding.

**B. Did the ALJ Err by Failing to Find that Appellant Had a Marked Limitation in Acquiring and Using Information?**

Second, Appellant argues that the ALJ erred in finding that Appellant had less than marked limitations in the domain of "acquiring and using information." [Doc. 15 at 18]. Appellant asserts that the ALJ did not compare Appellant's performance to that of students without impairments and ignored substantial evidence of her marked limitation in this domain. [Id. at 21]; [Doc. 17 at 3-4]. The Commissioner responds that, even though the ALJ found this to be a close question, substantial evidence supports the ALJ's finding that Appellant's standardized test results and IQ scores show her to be less than marked in this domain. [Doc. 16 at 16].

For the domain of acquiring and using information, the Commissioner's regulations provide that a child between the ages of six (6) and twelve (12) should be able "to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). Children of this age should be able to demonstrate their learning by "producing oral and written projects, solving mathematical problems, taking achievement tests, doing group

30

work, and entering into class discussions." Id. They should also be able "to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [their] own ideas, and by understanding and responding to the opinions of others." Id.

Examples of limitations in this domain include: having difficulty recalling important things learned in school the day before; having difficulty solving mathematics problems; talking only in short, simple sentences and having difficulty explaining what one means; not using language appropriate for age; and not reading, writing, or doing arithmetic at the appropriate grade level. 20 C.F.R. § 416.926a(g)(3)(iii-v); SSR 09-3p, 2009 WL 396025, at *6 (Feb. 17, 2009). The regulations define a "marked limitation" as one that "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities" in a particular domain. § 416.926a(e)(2)(i). Such a limitation is "more than moderate" but "less than extreme." Id. In assessing the extent of a child's limitations, the ALJ must "compare [the claimant's] functioning to the typical functioning of children [the claimant's] age who do not have impairments." § 416.926a(f)(1); accord SSR 09-3p, 2009 WL 396025, at *1.

Here, in finding Appellant's limitation in this domain to be less than marked, the ALJ recognized that her reading and writing

31

skills were at a fifth grade level, even when Appellant was in the seventh and eighth grades. (T. 22). The ALJ further considered "that she does receive special education sessions for extra help, particularly in reading, written expression and math, due to a learning disability," and that "this would indicate[] marked limitations in this domain." (Id.). Nevertheless, the ALJ found Appellant's limitations to be less than marked because she "has passed her [CRCT] testing, and has IQ scores of 87, 96, and 89." (Id.).

After carefully reviewing the record, the undersigned finds that the ALJ erred in finding Appellant's limitations in acquiring and using information to be less than marked. First, the exhibits the ALJ cited in support of his finding do not show that Appellant has passed her CRCTs. The only CRCT test records that appear in the record are for sixth grade and seventh grade, and each shows that Appellant's scores met the standard in only one of the multiple academic subjects tested. (T. 305-08). In the sixth grade, Appellant did not meet the standard for reading, mathematics, science, or social studies. (T. 306-08). In the seventh grade, Appellant's scores in reading, English/language arts, and science fell short of the standard. (T. 305). If Appellant retook either of these tests successfully at a later time, those scores do not appear in the record.

Furthermore, although the ALJ directly asked both Appellant and her mother whether Appellant had passed her CRCTs, their answers were less than clear as to whether Appellant had passed any CRCT since the fifth grade. At the hearing, Appellant gave the following testimony on examination by the ALJ:

Q    Have you ever had to repeat a grade?

A    No.

Q    And you had taken the CCRT [sic] test?

A    Yes.

Q    How did that go for you?

A    My reading is 780 something and my math is 805.

Q    Both of those passed?

A    I barely passed my reading.

Q    Okay and you passed the math?

A    Yes.

(T. 590-91). Later in her testimony, however, the following transpired on examination by Appellant's attorney:

Q    All right [sic], now as far as you saying you passed
     reading and writing you told me you were three grade
     levels below.

A    Yes.

Q    So how could you pass if you are three grade levels
     below?

33

A    I have trouble reading because I don't read a lot. [INAUDIBLE] I don't really like to read a lot unless my mom tells me I have to read or something.

Q    But that's not my question, my question is you told me that you read three levels below, did they test you three levels below?

A    Yes.

Q    So they didn't test on grade level?

A    No.

Q    Okay so you passed for three levels below?

A    Yes.

Q    Are you sure about that?

A    Yes.

Q    And so when you passed math, that was three levels below too?

A    Yes, similar to it like my reading too.

ALJ  The CCRT [sic] when you take that one, what are you taking a fifth grade or whatever grade you took it in?

A    I took fifth grade. I'm taking my CCRT [sic] fifth grade now.

Q    And so on that test, do they compare you to other fifth graders when you're taking the fifth grade?

A    Yes.

Q    Oh okay.

A    Similar to it and then they compare it with like last year when I was in the seventh grade, they compared it to other seventh graders in the level I'm on.

> Q    Okay I'm still confused because how could if they're comparing you to the same grade, how could it be a test three grade levels below?
>
> ALJ  When her mom testifies, we'll clarify that.
>
> ATTY Yes, she'll clarify it because I think she's confused.

(T. 594-95). Later in the hearing, Appellant's mother gave the following testimony to the ALJ:

> Q    Tell me about the CCRT [sic] that question about do they test her on the grade level that she's in.
>
> A    They test her on the grade level that she's in when she's low. They tried to go back and try to have her to understand the questions. At times she did have to retake it because I believe the fifth grade when we were here, she had to go to summer school and I asked them if she could go to summer school because of her low level in reading and she had some areas in math, she had low areas. So I asked them could she go to summer school.
>
> ALJ  Did that allow her to pass?
>
> A    That allowed her to pass by going to summer school because they were able to work with her at a slower pace and in smaller groups.

(T. 602-03). After reviewing the above testimony, the undersigned is not clear on whether Appellant also attended summer school and retook the sixth and seventh grade CRCTs, or whether she only did this in the fifth grade. State law does not require a student to have passed the sixth or seventh grade CRCTS in order to be promoted to the next grade, even though the law does require passing the fifth grade CRCT before moving on to the sixth grade. See O.C.G.A.

35

§ 20-2-283(b)(1). Thus, in light of the testimony at the hearing and the test scores on record, substantial evidence does not support the ALJ's finding that Appellant had passed her CRCTs.

Second, the exhibits the ALJ cited do not support his finding that Appellant's IQ scores at the time of filing or at the hearing were 87, 96, and 89. These scores come from the WISC-IV that Dr. Harris administered to Appellant in 2004, when she was eight (8) years old and in the third grade. (T. 266-67). The Commissioner's regulations provide the follow with respect to IQ scores:

> Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, . . . . IQ tests results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.

20 C.F.R. pt. 404, subpt. P, app. 1, sec. 112.00(D)(10). In this case, Appellant's mother protectively filed for benefits in 2007, more than two years after Appellant took the WISC-IV test. (T. 67). By the time Appellant received her administrative hearing, her IQ scores were nearly five years old. (T. 580). Thus, the ALJ's finding regarding Appellant's IQ during the relevant period is not supported by substantial evidence, as the scores he relied upon were no longer current. See Cruz v. Comm'r of Soc. Sec., No. 08-3721 (SRC), 2009 WL 2448517, at *3 n.5 (D.N.J. Aug. 10, 2009) (noting that fifteen-year-old claimant's IQ test scores were no longer current when test had been administered over two years before filing date).

36

The ALJ indicated that, but for Appellant's CRCT and IQ scores, her below average academic performance and need for special education assistance "would indicate[] marked limitations in [acquiring and using information]." (T. 22). As demonstrated above, substantial evidence does not support the ALJ's findings regarding Appellant's CRCT and IQ scores. Therefore, the ALJ erred in finding Appellant's limitations in the domain of acquiring and using information to be less than marked. Because the ALJ also found a marked limitation in the domain of attending and completing tasks, a marked limitation in acquiring and using information would total two marked limitations, thereby necessitating a finding that Appellant's limitations functionally equal the listings. Accordingly, the undersigned **RECOMMENDS** that the ALJ's decision be **REVERSED and REMANDED**. On remand, the ALJ should re-assess his findings regarding Appellant's limitations in acquiring and using information in accordance with the applicable statutory regulations. See 20 C.F.R. § 416.926a(f)-(g).

**C.    Did the ALJ Err in His Duty to Develop the Record?**

Third, Appellant argues that the ALJ failed to fulfill his duty to develop the record by denying her counsel's request for a consultative psychological examination and IQ test. [Doc. 15 at 21]. Appellant states that, despite the "clear evidence" of her psychological and cognitive impairments, the record was devoid of

37

a "comprehensive opinion of the severity of limitations within the Social Security disability context." [Id. at 23]. Appellant argues that, because the ALJ and state agency physicians did not have such evidence before them, she suffered prejudice and thus the ALJ should have ordered a consultative examination and IQ test to fill the "gap in the record." [Id.].

The Commissioner responds by arguing that such an examination was not needed because the record already contained "a comprehensive psycho-educational evaluation" of Appellant, along with numerous records of Appellant's performance in school. [Doc. 16 at 17]. The Commissioner thus argues that the ALJ committed no error in denying Appellant's counsel's request. [Id.].

At the administrative hearing, the ALJ denied the request of Appellant's counsel for IQ testing because Appellant's mother had testified to treating Appellant three times in the previous year at the Winn Way Mental Health Center. (T. 617, 620). Those treatment records, however, did not appear in the record before the ALJ. (T. 617). Accordingly, the ALJ allowed Appellant two weeks to submit her mental and behavioral health treatment records and denied the request for IQ testing "unless Wynn [sic] Way shows something that's unexpected that needs to be developed." (T. 620). After the hearing, Appellant's counsel submitted additional evidence to the record, including treatment records from the DeKalb Community Service Board,

38

(T. 546), of which the Winn Way Mental Health Center appears to be a component. See (T. 344, 549). Although the ALJ's statement at the hearing indicated that an "unexpected" finding in Appellant's mental health treatment records could warrant current IQ testing, the ALJ's written opinion only references those records to note a caseworker's statement "that it appears the claimant's mother seems motivated to get SSI, rather than a need for much treatment." (T. 21).

In light of the Court's decision above, see supra Part IV.B., finding Appellant's extant IQ scores too outdated to support a finding of Appellant's cognitive abilities, and because the ALJ relied on those outdated scores in finding Appellant not to be disabled, the undersigned finds the ALJ's decision not to order current IQ testing or a similar cognitive assessment to be erroneous. Cf. Jackson v. Astrue, No. 1:11cv91-MHT-WC, 2011 WL 6968324, at *6 (M.D. Ala. Dec. 19, 2011) (finding that ALJ did not err in failing to order current IQ testing when ALJ instead ordered psychological consultative examination). Accordingly, the undersigned **RECOMMENDS** that the ALJ's decision be **REVERSED and REMANDED**. On remand, should the ALJ find the remainder of the record, including Appellant's mental and behavioral health treatment records, inadequate to assess Appellant's cognitive abilities during the relevant period, the ALJ should order a current IQ test or consultative psychological examination.

39

**D. Did the ALJ Err in the Credibility Determination of Appellant and Her Mother?**

Finally, Appellant argues that the ALJ applied inappropriate standards in finding Appellant's and her mother's testimony not to be credible. [Doc. 15 at 23]. The Commissioner counters that Appellant's testimony about her school performance and extracurricular activities revealed little evidence of disabling limitations. [Doc. 16 at 20]. The Commissioner notes that, contrary to Appellant's assertion, the ALJ "essentially credited the testimony of [Appellant's] mother" regarding the challenge that Appellant's ADHD and learning disability pose to her education. [Id. at 22]. Nonetheless, the Commissioner argues that the ALJ properly considered Appellant's and her mother's testimony in light of the other evidence of record and reasonably concluded that Appellant did not functionally equal a listing. [Id.].

A credibility determination is an issue reserved to the Commissioner. See Ryan v. Heckler, 762 F.2d 939, 942 (11th Cir. 1985); Bloodsworth v. Heckler, 703 F.2d 1233, 1242 (11th Cir. 1983). Yet the ALJ does not necessarily have to make an explicit finding of credibility. See Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) ("A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case."). "[W]here proof of a disability is based upon subjective

40

evidence and a credibility determination is, therefore, a critical factor in the Commissioner's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983) (per curiam).

Upon reviewing the ALJ's decision, the undersigned finds that the ALJ did not make an explicit credibility determination with respect to the testimony of either Appellant or her mother. The undersigned agrees with the Commissioner that the ALJ "essentially credited" the testimony of Appellant and her mother. The ALJ acknowledged the mother's testimony that Appellant "is very hyper, has a learning disability, and has difficulty understanding her schoolwork, including reading, as well as difficulty with learning, and speaking loudly." (T. 20). In assessing the extent of Appellant's functional limitations, the ALJ's findings were largely consistent with this testimony: noting that Appellant was "functioning somewhat below her grade level[] in reading and written expression," (T. 22); that she "receive[d] special education sessions for extra help," (<u>Id.</u>); and that she had "some difficulties with easy distractibility[] and some impulsiveness," (T. 23).

Nevertheless, to the extent the ALJ discredited the testimony of Appellant and her mother based upon Appellant's successful CRCT passage and low average IQ scores, the Court finds this to be in

41

error. In light of the Court's decision above, <u>see</u> <u>supra</u> Part IV.B., finding that substantial evidence does not support the ALJ's findings regarding Appellant's CRCT and IQ scores, substantial evidence does not support the ALJ's discounting of the credibility of Appellant or her mother. Accordingly, having found the ALJ to have erred in his credibility determination, the undersigned **RECOMMENDS** that this case be **REVERSED and REMANDED** for further proceedings consistent with this Final Report and Recommendation. On remand, the ALJ should re-assess his findings regarding the credibility of Appellant's and her mother's testimony in light of the applicable statutory regulations and this Circuit's case law. <u>See</u> 20 C.F.R. § 416.929; <u>Tieniber</u>, 720 F.2d at 1255; <u>Foote</u>, 67 F.3d at 1562.

## VII.
## Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that the decision of the Commissioner finding Appellant not to be disabled be **REVERSED and REMANDED** for further proceedings consistent with this Final Report and Recommendation.

**SO REPORTED AND RECOMMENDED**, this 27th day of November, 2012.


　　　　　　　　　　　　　　*s/ E. Clayton Scofield*
　　　　　　　　　　　　　E. CLAYTON SCOFIELD III
　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)